**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

PAM HALE,                                                 CASE NO.: 1:12-CV-742

              Plaintiff,                                  Judge Michael R. Barrett

MERCY HEALTH PARTNERS,

              Defendant.

**OPINION AND ORDER**

This matter is before the Court on Defendant Mercy Health Partners' Motion for Summary Judgment.  (Doc. 13).  Plaintiff Pam Hale has filed a response in opposition (Doc. 21, 29), and Defendant Mercy Health Partners has filed a reply (Doc. 30).  This matter is now ripe for review.

## I.    FACTUAL OVERVIEW

The basic facts construed in favor of Plaintiff are as follows:

### A.  General Background

Plaintiff Pam Hale was employed by Defendant Mercy Health Partners from December 1999 until June 14, 2011.  (Doc. 22, p. 9; Doc. 13-2).  At the time of her termination, she was forty-four years old and employed as a "Buyer."  (Doc. 22, p. 9).  She split her time between the Anderson and Clermont hospitals.  (Id.)  Her primary responsibilities as a Buyer were to control inventory and to purchase drugs for the Anderson pharmacy.  (Id. at 10).  In 2010, Clermont recreated the Buyer position and selected Abigail Muchmore, a Pharmacy Tech at Clermont, to take on additional work as a part-time buyer at Clermont.  Plaintiff was asked to spend some time at Clermont assisting and training Muchmore in the Buyer role.  (Doc. 26, pp. 45-46).  By

1

June 2011, Plaintiff spent approximately one day a week at Clermont helping Muchmore. (Id. at 46).

Plaintiff also served as a timekeeper for the Anderson pharmacy in which role she had the ability to edit everyone's time and overtime records. (Doc. 22, p. 60). Other timekeepers for the Pharmacy Department included Muchmore, Donna Branham, and Craig Wright. (Doc. 24, Ex. 22; Doc. 22, pp. 60-61). Timekeepers had access to Defendant's electronic timekeeping system and were responsible for correcting any timekeeping errors by pharmacy employees prior to submitting their time to management for final approval. (Doc. 24, pp. 29-31; Doc. 22, pp. 60-61).

Bill Carroll, the Pharmacy Director, was Plaintiff's supervisor at the time of her termination. (Doc. 22, p. 18). Carroll oversaw the pharmacy operations at both the Anderson and Clermont facilities. He also generally provided the final approval of the timesheets. (Id. at 61-62).

**B. Timekeeping Training and Practices**

Mercy had a policy that required employees to clock in and clock out using the phone system. (Doc. 22, pp. 46-47). Plaintiff testified that the Pharmacy Department had an oral policy that was different. (Id. at 47). Plaintiff first was trained on recording her time in or around 2000 or 2001 by a former Pharmacy Buyer at Mercy Clermont. (Id.) Based on that training, Plaintiff believed it was acceptable to manually enter and edit her time in the computerized system. (Id.) To keep track of her time, Plaintiff made notes of her starting and ending times, and generally would enter several days of time at once. (Id. at 89-90, 92-93; Doc. 21-1, ¶ 7). Plaintiff also would add or change time due to working off-site, taking calls at home, or otherwise working from home. (Doc. 22, pp. 90-94).

2

In or about April 2008, Plaintiff attended a training session concerning time-keeping practices.  (Doc. 22-12; Doc. 22-13).  The presentation for that training session contains, among other things, the following statements:

- "Timekeepers have a responsibility to try to make sure that the timecards are correct and accurately reflect the time worked by each employee.  If there are missed punches, the timekeepers should attempt to resolve them.  If an employee is not clocking correctly, this should be reported to a manager, so the employee can be properly instructed." (Doc. 22-13, p. 6).

- "Timekeepers <u>may</u> <u>not</u> edit timecards to change punches, delete punches, remove overtime, or in any other way change the timecard to change the time actually worked by the employee." (Id. at 7).

- "Timekeepers should *never*, even if the employee says it's okay, reduce the hours on an employee's time card to avoid overtime.  This is true even if the reduction is as small as five minutes." (Id.)

- "Overtime must be paid to employees who work, even if it was not authorized or approved by Management staff.  Unauthorized overtime must be handled through corrective action, not through adjustments to an employee's timecard." (Id.)

- "A timekeeper falsifying or tampering with employees' timecards can create significant legal problems for the Hospital and can be a reason for a timekeeper's corrective action and/or termination." (Id.)

- "**When in doubt, check with Human Resources before deleting!**" (Id.)

## C. June 10, 2011 Conversations with DEA

At approximately 11:00 a.m. on June 10, 2011, Plaintiff spoke with a representative from the Drug Enforcement Agency ("DEA").  (Doc. 22, pp. 105-06; Doc. 21-1, ¶ 9).  During that phone call, the DEA agent asked Plaintiff about Mercy Clermont's record-keeping practices for drugs that were being used at a satellite facility in Mt. Orab.  (Doc. 22, pp. 105-06, 115-16).  Plaintiff informed the agent that she was properly verifying the invoices with the required DEA form, but that she could not attest to whether everyone else was doing so.  (Id. at 108-09).  Although Plaintiff believed that Muchmore, the Clermont Buyer, was inappropriately completing

the documentation, she did not inform anyone of her belief.  (Id. at 109).[1]  After the phone call, she informed Carroll that the DEA had called.  (Id. at 109, 115).  She did not directly tell him why the DEA had contacted her, but informed him that they were checking on the Mt. Orab situation.  (Id. at 115).  Other than the conversation with Carroll, Plaintiff did not inform anyone at Defendant of the phone call or that she was participating in any investigation by the DEA or any other regulatory body.  (Id. at 114-15).

Carroll testified that Plaintiff informed him that the DEA had called that morning.  (Doc. 26, p. 53).  According to Carroll, Plaintiff indicated that she did not know what the DEA wanted but thought it related to the DEA 222 Forms being incomplete.  (Id.)  Carroll returned the DEA agent's phone call.  (Id.)  Several weeks later, Carroll's boss called him after receiving a call himself from the DEA agent.  (Id. at 54).  At that time, Carroll explained to his boss that the DEA wanted to make sure that the Mercy Hospitals knew how to properly fill in DEA paperwork.  (Id. at 54).  Carroll testified that Plaintiff's name was never mentioned during any conversation between the DEA agent and Carroll, or in any subsequent conversation about the DEA 222 Form.  (Id. at 55-56).  Carroll does not recall ever discussing the DEA issue with Clermont's Chief Executive Officer Gail Heintzelman.  (Id. at 56).

### D.  June 10, 2014 Timecard Audit

According to Defendant, Heintzelman met with Mark Holmes, a pharmacist at Clermont, at 10:00 a.m. on June 10, 2011.  (Doc. 25, pp. 9-10).  Heintzelman testified that Holmes had an inventory issue and he was unable to reach Plaintiff using the contact information she had available.  (Id. at 11).  Heintzelman testified that Holmes contacted her because Carroll, Plaintiff's supervisor, was unavailable.  (Id. at 10).

---

[1] She testified that she did not remember whether she told Carroll.  (Doc. 22, p. 109).

Heintzelman testified that her response to Holmes was to contact Laura Gaynor, the Clermont Human Resources Consultant, and order an audit of Plaintiff's clock-in and clock-out times to see how much time Plaintiff was spending at the respective hospital locations.  (Id. at 11-12).  The documentation indicates that the timecard audit was executed on June 10, 2011 at 12:04 p.m.  (Doc. 13-9).  At 2:34 p.m. on June 10, 2014, Gaynor emailed Heintzelman to indicate that she and the Human Resources Coordinator reviewed the timecard audit of Plaintiff, which was "very interesting."  (Doc. 24, pp. 40-42; Doc. 24-1).  Gaynor testified that it was an email from Holmes to Heintzelman that was sent at 4:39 p.m. on June 10, 2011, and which was later forwarded to Gaynor, that formed the basis of the audit request.  (Doc. 24, p. 54; Doc. 24-4).

At 5:17 p.m. on June 10, 2011, Gaynor emailed Shelly Sherman, the Human Resources Director, concerning timekeeping issues involving Plaintiff, which she identified as follows:

- "Although she is supposed to be at Clermont at least 40 hours per pay period, "[s]he has only been averaging 16 hours of time per pay period [at Clermont] but [it is] hard to determine because she never clocks in/out."  (Doc. 24-2).

- "Not clocking in/out at all through phone system for all 4 pay period we reviewed, she is non-exempt."  (Id.)

- "Editing own time – Questionable edits (for example adding an hour to her clock out 3 days later)[.]"  (Id.)

- "Entering time prior to actual day worked[.]"  (Id.)

- "Always clocking no lunches, editing days later – questionable[.]"  (Id.)

- "Approving 2 of her own time sheets or no approval on one pay period[.]"  (Id.)

Gaynor stated that the problems were "serious if all of this is not explainable."  (Id.)

On June 13, 2011 at 8:27 a.m., Gaynor emailed Heintzelman summarizing her concerns about the June 10, 2011 audit and concerning a request to review time records for June 10, 2011. (Doc. 24-4).  She asked to discuss the issue with Heintzelman that morning.  (Id.)

### E.  Defendant's Corrective Action Policy

Defendant's Corrective Action policy provides guidelines on when and to what extent corrective action is appropriate for an employee's workplace behavior.  (Doc. 22-9).  Generally, a four-level procedure is used to resolve employee problems and deficiencies.  (Id.)  The four levels include verbal counseling, written counseling, final written counseling, and discharge. (Id.)  Certain conduct, however, may warrant bypassing one or more of the levels.  (Id.)  Among the conduct that may warrant immediate termination is "[a]ltering, destroying or falsifying records, including one's own time or another's time record[.]"  (Id.)

### F.  Plaintiff's Termination

On June 14, 2011, Plaintiff was informed that she had a meeting with Heintzelman at 2:00 p.m.  (Doc. 22, p. 43).  Plaintiff informed Carroll of the meeting.  (Doc. 26, p. 35).  At the time, Carroll was unaware of the reason for the meeting.  (Id.)

Carroll testified he was summoned to a meeting with Heintzelman and Sherman later that same day before Plaintiff's meeting.  (Id. at 25-27).[2]  During the meeting, Carroll was asked to comment on the time card audit of Plaintiff.  (Id. at 27-29).  In particular, he was asked why Plaintiff had not been clocking in and out using the phone system, had manually added time after the fact, and had made future clock-ins.  (Id. at 27-31).  Carroll was unable to explain Plaintiff's failure to use the phone system or her future clock-ins, but he indicated that she had off-site meetings that may explain some alterations.  (Id. at 29).  At the conclusion of the meeting, Carroll was instructed to prepare "Plan B," which he interpreted to mean that he should plan a schedule that did not include Plaintiff.  (Id. at 33-34).

---

[2] Gaynor testified that she did not meet with Carroll before Plaintiff's termination.  (Doc. 24, pp. 24, 44, 90).  Heintzelman did not recall speaking with Sherman prior to meeting with Carroll and could not recall if anyone else was present at the meeting with Carroll.  (Doc. 25, pp. 23-25).

At 2:00 p.m. that afternoon, Plaintiff met with Heintzelman and Gaynor.  (Doc. 22, p. 43).  No explanation was provided to Plaintiff as to the structure of the meeting.  (Id. at 45).  During the meeting, Plaintiff was shown her termination letter first.  (Doc. 21-1, ¶ 11).[3]  Plaintiff next was shown, but not given, the time card audit when it was placed in the middle of the table.  (Id.)  She did not have an opportunity to fully review those documents during the meeting.  (Id.)  Gaynor did, however, go over "a few" of the dates with Plaintiff for which Plaintiff did not provide a specific explanation.  (Id. at 46).  Instead, when Gaynor asked for explanations on certain dates, Plaintiff indicated that she could explain the edits if she had her calendar or something to reference.  (Id.)  Plaintiff did not ask for more information during the meeting nor did she admit to or deny altering her timesheets.  (Id.)

After the meeting, Plaintiff sought out Carroll.  (Doc. 26, p. 39).  She handed him her employee badge.  (Id.; Doc. 22-1, ¶ 15).  Carroll believed that Plaintiff's behavior was unusual.  (Doc. 26, p. 39).

Plaintiff was replaced by Mallory Lane, who is a female in her twenties.  (Doc. 22, p. 70; Doc. 26, p. 44).

### G.  Subsequent to Termination

Following Plaintiff's termination, Defendant conducted an audit of the timekeeping for other employees serving as Timekeepers in the Pharmacy Department.  (Doc. 24, pp. 101-02; Doc. 24-7; Doc. 24-10; Doc. 24-11).  The audit showed that Donna Branham, a Lead Pharmacist at Clermont who is under forty, had accessed the system to manually add several in and out

---

[3] Plaintiff cites to her declaration in which she indicates that she was given the termination letter prior to being given an opportunity to explain her timecard edits.  Defendant contends the declaration is inconsistent with her deposition testimony where she stated she was never given anything during the meeting, and that the inconsistent statement in the declaration is insufficient to create any genuine issue of material fact for trial.  *See Robbins v. Saturn Corp.*, 532 F. App'x 623, 630 (6th Cir. 2013).  While Plaintiff was questioned about the procedures of the meeting during her deposition and did not provide that detail at that time, that questioning was not so clear as to the termination letter to make the Plaintiff's declaration plainly inconsistent with her testimony.

punches, and to clock skipped meals.  (Doc. 24-7; Doc. 24-10).  She was not terminated.  It also showed that Abby Muchmore, a thirty year-old Pharmacy Buyer for Clermont, had made manual edits adding in and out punches, and entered Paid Time Off and floating hours to a secondary position.  (Doc. 24-7; Doc. 24-10).  She was not terminated.  The audit of Craig Wright, a Lead Pharmacist at Anderson who was in his thirties, showed multiple manual edits were made to his timecard after the fact and lunches were deducted.  (Doc. 24-11)  Wright had left the employ of Defendant's Pharmacy Department on or about April 21, 2011.  (Doc. 24-9; Doc. 24-11; Doc. 22, p. 80; Doc. 26, p. 22).

Plaintiff appealed her termination to Defendant's peer resolution team consisting of Defendant's employees from other hospitals.  (Doc. 22, pp. 24-25).  In support of her grievance, she prepared two grievance letters in which she attempted to explain her reasons for the alterations to her time cards, which included off-site meetings, working from home and working through lunch.  (Doc. 22-4; Doc. 22-5).  She also stated that "What I did was unethical but I feel the result of termination was also unethical."  (Id.)  The peer resolution team sustained her termination.  (Doc. 22-3).

Plaintiff also filed a grievance with the Equal Employment Opportunity Commission ("EEOC").  (Doc. 22, pp. 22-23; Doc. 22-1).  The EEOC was unable to conclude that the information presented established a violation of the requisite discrimination statutes.  (Doc. 22, p. 24; Doc. 22-1).

In connection with her Application for Determination of Benefit Rights, Plaintiff was granted a hearing by the Unemployment Compensation Review Commission.  The Commission determined that Plaintiff was discharged without just cause in connection with her work because

she utilized known practices to maintain her time records and the evidence did not show she knowingly falsified those time records.  (Doc. 21-1, Ex. B).

## II.  <u>LEGAL STANDARD</u>

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" only if its resolution affects the outcome of the suit.  *Id.*

On summary judgment, a court must view the evidence and draw all reasonable inferences in favor of the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).  The moving party has the burden of showing an absence of evidence to support the nonmoving party's case.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

Once the moving party has met its burden of production, the nonmoving party cannot rest on his pleadings, but must present significant probative evidence in support of his complaint to defeat the motion for summary judgment.  *Anderson*, 477 U.S. at 249.  "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]."  *Id.* at 252.  Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.

## III.  <u>ANALYSIS</u>

Defendant moves for dismissal of Plaintiff's claims for (1) age discrimination under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et. seq.*; (2) gender discrimination under Ohio Rev. Code §§ 4112.02(A) and 4112.99; and (3) wrongful discharge in violation of public policy.

### A. **ADEA Claim**

The ADEA prohibits employers from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a). "The burden of persuasion is on the plaintiff to show that 'age was the "but-for" cause of the employer's adverse action.'" *Blizzard v. Marion Tech. College*, 698 F.3d 275, 283 (6th Cir. 2012) (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177, 129 S. Ct. 2343, 174 L. Ed. 2d 119 (2009)). "A plaintiff 'may establish a violation of the ADEA by either direct or circumstantial evidence.'" *Id.* (quoting *Geiger v. Tower Auto.*, 579 F.3d 614, 620 (6th Cir. 2009)). Where the plaintiff fails to present direct evidence of age discrimination, the claim is analyzed using the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Under *McDonnell Douglas*, a plaintiff has the burden of proving a *prima facie* case of discrimination. To do so, a plaintiff must show that: (1) she was a member of a protected class; (2) she suffered an adverse employment action; (3) she was qualified for the position; and (4) she was replaced by someone outside the protected class or was treated differently than similarly-situated employees outside the protected class. *DiCarlo v. Potter*, 358 F.3d 408, 415 (6th Cir. 2004). If a *prima facie* case can be shown, then the burden shifts to the defendant to prove a legitimate, nondiscriminatory basis for the termination. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254-56 (1981). If the defendant carries that burden, then the plaintiff

10

must show that the legitimate, nondiscriminatory basis is, in fact, only a pretext to hide the discrimination. *McDonnell Douglas*, 411 U.S. at 802.

Defendant concedes for the purposes of its motion for summary judgment that Plaintiff is able to satisfy the *prima facie* case of age discrimination by proffering evidence that (1) she is over 40, (2) she was terminated; (3) she was otherwise qualified for the position; and (4) she was replaced by a younger non-protected individual. (Doc. 13, p. 8). Plaintiff likewise concedes that Defendant has proffered legitimate non-discriminatory reasons for its termination, which are that Plaintiff altered and falsified time records and approved her own timesheets in violation of Defendant's timekeeping policy. (Doc. 13, p. 8). Thus, the only dispute is whether Plaintiff is able to show that Defendant's legitimate business reasons are pretextual.

There are three interrelated way in which the plaintiff may prove pretext: (1) by showing that the proffered reasons had no basis in fact, (2) by showing that the proffered reasons did not actually motivate the employer's action, or (3) by showing that the proffered reasons were insufficient to motivate the employer's action. *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012) (citing *Romans v. Mich. Dep't of Human Servs.*, 668 F.3d 826, 839 (6th Cir. 2012); *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009)). To carry her burden in opposing summary judgment, the plaintiff "need only produce enough evidence to support a *prima facie* case and to rebut, but not to disprove, the defendant's proffered rationale.'" *Griffin v. Finkbeiner*, 689 F.3d 584, 593 (6th Cir. 2012) (quoting *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 532 (6th Cir. 2007)).

When, however, a defendant has an "honest belief" in the non-discriminatory basis upon which it made its employment decision, the plaintiff will not be able to satisfy her burden. *Tingle*, 692 F.3d at 530 (citing *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106,

1117 (6th Cir. 2001)). "The employer's claim of honest belief is necessarily tied to the nature of its investigation and disciplinary decision process." *Tingle*, 692 F.3d at 531. The Sixth Circuit has recognized that the "key inquiry . . . is 'whether the employer made a reasonably informed and considered decision before taking' the complained-of action." *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 598-99 (6th Cir. 2007) (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998)). Although the employer must point to particularized facts upon which is reasonably relied in making its employment decision, the decisional process used by the employer need not be optimal or leave no stone unturned. *Smith*, 155 F.3d at 807; *see also Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 398 (6th Cir. 2008). A defendant thus may rely on the honest belief rule "'even if its conclusion is later shown to be 'mistaken, foolish, trivial or baseless.'" *Chen*, 580 F.3d at 401 (quoting *Clay v. UPS*, 501 F.3d 695, 713-15 (6th Cir. 2007)).

To defeat a summary judgment motion in such circumstances, the "plaintiff must produce sufficient evidence from which the jury could reasonably reject [the defendant's] explanation and infer that the defendant[ ] . . . did not honestly believe in the proffered non-discriminatory reason for its adverse employment action." *Braithwaite v. Timken Co.*, 258 F.3d 488, 493-94 (6th Cir. 2001). For example, the plaintiff may produce evidence that an error by the employer was "too obvious to be unintentional." *Smith*, 155 F.3d at 807.

Here, Plaintiff has not satisfied her burden of showing Defendant's proffered reasons were a pretext for age discrimination. Initially, Plaintiff has set forth explanations for some, but not all, of her manual edits and alterations, and has testified that she believed her alterations were permitted and consistent with her training. Assuming that those explanations would be suggestive of a mistaken decision by Defendant, it is necessary to consider the honest belief of Defendant. *See Clay v. UPS*, 501 F.3d 695, 714-15 (6th Cir. 2007).

12

At the time Defendant terminated Plaintiff, it had:

- Obtained a time card audit that reflected numerous manual alterations to her time;

- Obtained the assistance of the Human Resources Coordinator to put the timecard audit into context;

- Identified the concerns it had about the timecard audit, which included not clocking in or out through the phone system, editing her own time, making questionable edits, entering time prior to the actual day worked, always clocking no lunches but editing days later, and approving her own timesheets or not obtaining any approval for her timesheets;

- Had in existence a policy that permitted immediate termination for the alteration and falsification of time card records;

- Questioned Carroll about the timecard audit and Plaintiff's alterations; and

- Met with Plaintiff in regards to the timecard audit, during which meeting Plaintiff did not admit or deny falsifying the timesheets, and indicated she could explain the alterations with her calendar but provided no general explanation for the alterations.

Plaintiff does not deny that she made the numerous alterations, that the policy permitted immediate termination for alterations and falsification, or that that she had a meeting with Defendant concerning the alterations on the day she was terminated. She also admits that she understands why Defendant may have viewed her multiple modifications as a violation of Defendant's policy. (Doc. 22, p. 56).

To the extent Plaintiff seeks to challenge Defendant's honest belief by again arguing that she was not actually guilty of falsifying her time records, that challenge is unavailing. While her explanations may indeed show that some of her records were not actually falsified, "'arguing about the accuracy of the employer's assessment is a distraction because the question is not whether the employer's reasons for a decision are *right* but whether the employer's description of its reasons is *honest*.'" *Tibbs v. Calvary United Methodist Church,* 505 F. App'x 508, 514 (6th Cir. 2012) (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 806 (6th Cir. 1998)). Plaintiff instead

must offer evidence from which a jury could reasonably reject Defendant's stated reason for terminating her and conclude that it used those reasons to mask its discriminatory motive.

Plaintiff's second set of challenges concerns the investigatory procedures employed by Defendant prior to her termination. In particular, Plaintiff offers evidence that (1) she was not given a meaningful opportunity to explain the reasons for the alterations; (2) Defendant decided to terminate her before speaking with her, as reflected by testimony that prior to the meeting Carroll was directed to prepare a schedule without Plaintiff on it and by the fact that a termination letter had been written prior to the meeting with Plaintiff; and (3) there are other miscellaneous factual disputes concerning her termination. She claims the evidence sufficiently suggests that Defendant failed to make a reasonably informed and considered decision prior to her termination. The Court disagrees.

The evidence relied upon by Plaintiff does not demonstrate individually or collectively that Defendant's process was so questionable that it might be deemed unworthy of credence. *See Tibbs*, 505 F. App'x at 514. Although the evidence may show in hindsight that Defendant made incorrect inferences and could have been more thorough in how it reached its decision, Defendant's decisional process need not be optimal to demonstrate an honest belief. The evidence presented by the parties reflects that Defendant discovered numerous manual alterations on Plaintiff's timecard and perceived her lack of a basic explanation for the alterations to confirm its belief that Plaintiff violated its policy.[4] Although Plaintiff argues that her silence plausibly was the result of her "stunned disbelief" about what had happened (Doc. 29, p. 17), the

---

[4] Plaintiff's declaration statement indicating she told Gaynor she worked from home on occasion is not relied upon here, as Plaintiff did not provide any such testimony when describing the same issues on the same subject during her deposition. *Robbins v. Saturn Corp.*, 532 F. App'x 623, 630 (6th Cir. 2013). In any event, that statement does not account for the numerous alterations and edits to her timecard.

14

reason for her silence is immaterial, as the question is whether Defendant could have reasonably relied upon her silence in deciding whether to terminate her.

Considering that Defendant could have reasonably relied upon Plaintiff's lack of basic explanation for the alterations and her silence, its failure to provide Plaintiff with the opportunity to reconcile each record with her calendar does not demonstrate Defendant did not honestly believe in its reasons for terminating Plaintiff. While ideally Defendant would have provided Plaintiff with such an opportunity, there is no requirement that Defendant leave no stone unturned during its investigation. The information it had before it at the time it terminated Plaintiff was sufficient to warrant the action taken by Defendant.[5] *See Zielinski v. Interstate Brands Corp.*, No. 3:08cv2077, 2010 U.S. Dist. LEXIS 30433, at *13 (N.D. Ohio Mar. 30, 2010) (finding no triable issue of pretext where employee failed to explain unaccounted for time on timesheets even though he argued, among other things, that he was precluded from adequately explaining the evidence against him).

Defendant's decision also is not rendered unworthy of credence as a result of its pre-approval to terminate Plaintiff or its provision of a termination letter to Plaintiff at the outset of the meeting. *See Seeger v. Cincinnati Bell Tel Co.*, 681 F.3d 274, 286 (6th Cir. 2012) ("[A]n 'optimal' investigation – i.e., interviewing the employee and some or all of his witnesses – is not a prerequisite to application of the honest belief rule.") (citing *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998); *McConnell v. Swifty Transp., Inc.*, 198 F. App'x 438, 444 (6th Cir. 2006)). The only case from this circuit that is relied upon by Plaintiff is distinguishable. *Archer v. Mesaba Aviation, Inc.*, No. 98-2434, 2000 U.S. App. LEXIS 6420, at *10, *18-19 (6th Cir.

---

[5] Although of little value to the pretext analysis, it also is noted that Plaintiff did not attempt to reconcile those timecards with her calendar during her grievance hearings and still has not been able to explain many of her alterations even when given the opportunity to review her calendar.

Apr. 3, 2000).[6]  In *Archer*, the incident at issue involved an employee's behavior on a flight as observed and reported by other employees.  *Id.*  The employer obtained statements from the employees who were on the flight at the time of alleged incident, but those statements were conflicting.  *Id.*  It was not clear whether the employer ever read those statements before deciding to terminate the plaintiff.  *Id.*  Adding to the skepticism about the employer's honest belief was the fact that the employer had prepared the termination letter before giving the plaintiff a chance to respond to the conflicting allegations, and actually terminated Plaintiff before he turned in his response to the allegations.  *Id.* at *10, *19.  Here, unlike in *Archer*, Defendant did not have conflicting evidence before it as to Plaintiff's approval of her own time or her manual entering and altering of her timecards on multiple occasions before and after the time and dates she actually worked.  Defendant also had from Carroll no explanation as to at least two areas of concern about Plaintiff's timecard audit.  Moreover, in further contrast to *Archer*, Plaintiff had the opportunity to defend herself by providing a general explanation for her conduct during the  meeting, which she did not do.  *See McConnell*, 198 F. App'x at 444 (holding that employer had an honest belief where it made the decision to terminate the plaintiff before questioning him, but still gave him an opportunity to explain).  Defendant's decision not to continue to investigate the issue does not demonstrate that its belief was not honestly held at the time it terminated Plaintiff, and the Court may not substitute its own judgment for the reasoned judgment of a business decision-maker.

Plaintiff's further reliance on disputes as to the length of the meeting and whether she made the comment "I shouldn't have done these" during the meeting does not change the Court's

---

[6] Plaintiff also cites to two cases outside of this circuit that are not binding upon this Court.  *See McCallum v. Archstone Communities*, No. JFM-12-01529 (D. Md. Oct. 12, 2013); *Commission on Human Rights and Opportunities v. Proctor & Gamble Pharmaceuticals, Inc.*, CHRO No. 0330171 (Conn. Comm'n Human Rights & Opportunities July 12, 2006).

conclusion. Those factual disputes are insignificant or immaterial, as they do not change the central finding that Plaintiff approved her own time and made multiple manual edits and alterations inconsistent with the written policy of Defendant without providing a general explanation for that conduct. *See Tingle*, 692 F.3d at 532; *McConnell*, 198 F. App'x at 444. While Defendant's decisional process may be imperfect, it does not contain errors that are so obvious, intentional, or unexplainable so as to make Defendant's proffered reasons unworthy of credence.

Nor has Plaintiff shown pretext with evidence that other similarly situated employees were not terminated for the same conduct. This showing ordinarily "consists of evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff." *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994). While the facts seem to suggest that there indeed are other timekeepers under forty years of age, including Muchmore, Wright, and Branham,[7] who have not been terminated for editing time punches, the Court finds that none of those individuals are proper comparators. *See Hilbert v. Ohio Dep't of Rehab. & Corr.*, 121 F. App'x 104, 112 (6th Cir. 2005).

Plaintiff contends that Muchmore is a proper comparator because Muchmore edited her own time and made a prospective clock-out, but was not summoned by Defendant to a meeting with Heintzelman and was not terminated or otherwise disciplined. The evidence fails to show not only that Defendant was aware of Muchmore's conduct prior to Plaintiff's termination, but also that Muchmore's conduct was substantially identical to Plaintiff's conduct in this instance.

---

[7] Plaintiff does not specifically identify in her opposition brief any comparators other than Muchmore for her age discrimination claim. Instead, she vaguely refers to other individuals as having engaged in similar conduct. The Court assumes based on the earlier statements in the brief that Plaintiff intends Wright and Branham to be comparators.

Plaintiff admits that Muchmore did not alter her time records to the same or similar degree as Plaintiff, and the timecard audit for Muchmore reflects that her edits and alterations were not nearly as frequent, numerous, or unsystematic as Plaintiff's edits and alterations.

As for Wright, Plaintiff admits that he did not make as many edits to the timecards as Plaintiff, did not have as many future clock-ins as Plaintiff, and did not provide credit for lunch quite as often Plaintiff. Although a review of his timecard audit reflects that he did make multiple edits, it appears that once that audit was conducted Wright was no longer employed by a Mercy entity.[8] To the extent that Plaintiff contends that Wright should have been terminated for his conduct while still employed in the Pharmacy Department, that argument is unavailing. Although Plaintiff contends that she knew about Wright's conduct while he still was employed, no evidence has been presented that she informed management of his conduct or that management otherwise independently became aware of his conduct. She cannot base a claim on the lack of action against a comparator about whose conduct management was unaware. *See Novotny v. Reed Elsevier*, 291 F. App'x 698, 704 (6th Cir. 2008) (one flaw in the plaintiff's argument concerning similarly situated non-protected employees was that only her violations were reported to management during her employment). Nor does the Court impose a burden on an employer to engage in the exact same investigation of all similar employees at the same time it becomes aware of a situation that warrants action for one specific employee.[9]

Branham likewise did not alter her time records to the same or similar degree as Plaintiff. Although she did make several manual punches to add time and skip meals, the records did not

---

[8] Plaintiff admits that Wright left the Pharmacy Department in April 2011 prior to her termination and prior to the timecard audit. (Doc. 29, p. 6).

[9] Although not clear from Plaintiff's opposition brief, it is possible that Plaintiff is arguing that Wright was treated differently because he was never subject to an audit by Defendant while employed in the Pharmacy Department. The mere fact that Defendant was not audited and Plaintiff was audited based upon a situation specific to her does not constitute the type of different treatment that reasonably shows pretext on the part of Defendant.

18

show any editing of timecards or frequent manual additions or alterations days after the date worked.

Plaintiff's final argument is that the inconsistencies in Defendant's explanation of why the timecard audit was conducted in the first instance demonstrate that Defendant was not actually motivated by the proffered reasons. In making a motivation argument, a plaintiff must show that the "sheer weight of the circumstantial evidence of discrimination makes it more likely than not that the employer's explanation is a pretext, or coverup." *Manzer*, 29 F.3d at 1084. While there indeed is a lack of clarity as to what prompted the timecard audit, a scintilla of evidence is not enough to survive summary judgment. The sheer weight of that evidence together with the evidence discussed above does not support a finding that the explanation was a pretext for age discrimination.

### B. Gender Discrimination Claim

Plaintiff brings her gender discrimination claim under Ohio Rev. Code §§ 4112.02(A) and 4112.99. According to the Ohio Supreme Court, federal caselaw interpreting Title VII is equally applicable to discrimination claims brought under Ohio law. *Staunch v. Cont'l Airlines, Inc.*, 511 F.3d 625, 631 (6th Cir. 2008) (citing *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Com.*, 66 Ohio St. 2d 192 (1981)). As explained previously, a discrimination claim can be proven by direct or circumstantial evidence of discrimination. As Plaintiff has not presented direct evidence of gender discrimination, her claim is subject to the *McDonnell Douglas* burden-shifting framework set forth above in regards to her age discrimination claim. With respect to that burden-shifting framework, the parties dispute

19

whether Plaintiff has met her burden of establishing (1) the fourth prong of her *prima facie* case and (2) pretext.[10]

### 1. Fourth prong of *prima facie* case

Given that it is uncontroverted that Plaintiff was not replaced by male, she must establish the fourth prong of her *prima facie* case by showing that she was treated differently than similarly-situated employees who were outside the protected class. *Humenny v. Genex Corp.*, 390 F.3d 901, 906 (6th Cir. 2004). To satisfy that burden, Plaintiff must show that she was "similarly situated to the [claimed comparator] in all relevant respects." *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 710 (6th Cir. 2006). In the disciplinary context, the Sixth Circuit has held that to be found similarly situated the "plaintiff and [her] proposed comparator must have engaged in acts of 'comparable seriousness.'" *Id.* (quoting *Clayton v. Meijer, Inc.*, 281 F.3d 605, 611 (6th Cir. 2002). *Accord: Macy v. Hopkins Cnty. Sch. Bd. of Educ.*, 484 F.3d 357, 370 (6th Cir. 2007) (explaining that where incidents of misconduct giving rise to discipline form the crux of the similarities between employees, the degree of their misconduct is a factor to be given great weight). To make this assessment, a court must look "to certain factors, such as whether the individuals 'have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *Wright*, 455 F.3d at 710 (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998)).

Plaintiff's evidence of disparate treatment is limited to two males – Wright and Mark Johnson. Yet, neither Wright nor Johnson is similarly situated because there are substantial and relevant differences in the circumstances and conduct.

---

[10] It is uncontroverted that Plaintiff is a female, was otherwise qualified for her job, was terminated and was not replaced by a male.

As explained with respect to the age discrimination claim, the evidence shows that management was not aware of those alterations so as to take corrective action while Wright was still employed by a Mercy entity.[11]  Plaintiff's argument that Defendant treated her differently by failing to audit Wright's timecards and terminate Wright for the edits and alterations discovered as a result of that audit while he was still employed in the Pharmacy Department does not withstand scrutiny for the same reasons set forth above.

With respect to Johnson, Plaintiff contends that he was treated more favorably because he received a warning prior to his termination.  Not only does it appear that different personnel were involved in handing down Johnson's discipline, but the evidence also reflects that the edits that led to his initial warning were not of the same degree as the edits made by Plaintiff.  (Doc. 21-1, Ex. C).  Further, unlike Plaintiff, Johnson denied that he actually made any of the edits himself.  (Id.)  Those differentiating and mitigating circumstances distinguish his conduct or Defendant's treatment of him for it.  Importantly, when Defendant later discovered that Johnson had made twenty-three edits to his time card since his initial warning, Defendant terminated Johnson.  (Id.) Plaintiff thus cannot rely on Johnson as a proper comparator.

Given that neither Wright nor Johnson is similarly situated, Plaintiff cannot satisfy the fourth prong of her *prima facie* case, and her gender discrimination claim thus fails.  For the sake of completeness, however, the Court will briefly address the pretext argument below.

### 2.  Pretext

The parties present essentially the same arguments here as they did for the age discrimination claim, with the one exception being the comparators relied upon by Plaintiff.  As the Court has explained previously, the evidence does not show that Defendant's decisional

---

[11] Plaintiff admits that Wright left the Pharmacy Department in April 2011 prior to her termination and prior to the time card audit.  (Doc. 29, p. 6).

process was unworthy of credence, that any of the male comparators are proper, or that the sheer weight of the evidence suggests that Defendant's proffered reasons are a cover-up for discrimination. Plaintiff thus has failed to satisfy her burden of proving pretext.

### C. Public Policy Claim

Employment in Ohio is governed, with some exceptions, by the employment at-will doctrine. *Leininger v. Pioneer Nat'l Latex*, 115 Ohio St. 3d 311, 312 (2007). An employer generally may terminate an at-will employee for any reason at any time and that terminated at-will employee may not sue the employer for wrongful discharge. *Id.* Ohio, however, recognizes an exception to the at-will doctrine for a wrongful discharge claim when the discharge violates public policy, which is commonly referred to as a *Greeley* claim. *Pytlinski v. Brocar Prods., Inc.*, 94 Ohio St. 3d 77, 78 (2002) (citing *Greeley v. Miami Valley Maintenance Contractors*, 49 Ohio St. 3d 228 (1990)). To prove a claim for wrongful discharge in violation of public policy, a plaintiff must satisfy four elements: (1) a clear public policy manifested in state or federal law (clarity element); (2) dismissal under circumstances like those involved here would jeopardize that public policy (jeopardy element); (3) dismissal motivated by conduct related to the public policy (causation element); and (4) lack of an overriding business justification by the employer for the dismissal (overriding justification element). *Collins v. Rizkana*, 73 Ohio St. 3d 65, 69-70 (1995). The first two elements present questions of law to be determined by the Court while the last two elements present questions of fact for the trier of fact. *Id.; see also Hale v. Volunteers of America*, 158 Ohio App. 3d 415, 424 (1st Dist. 2004).

Here, the parties dispute all four elements of the claim.

### 1. Clarity Element

Clear public policy justifying an exception to the employment at-will doctrine may be found in federal or state constitutions, statutes, administrative rules and regulations and common law. *Sutton v. Tomco Machining, Inc.*, 129 Ohio St. 3d 153, 157 (2011). Plaintiff concedes that she did not attempt to bring a public policy claim under the whistleblower statute in Ohio Rev. Code § 4113.52. When that statute has not been invoked, Plaintiff must "identify a source of public policy separate from the public policy embodied in Ohio Rev. Code § 4113.52" to establish her public policy claim. *Hale*, 158 Ohio App. 3d at 425. Plaintiff contends that the clear public policies applicable here are: (1) that pharmacies maintain proper transport and record-keeping processes to ensure the narcotics are properly accounted for by the pharmacies as required by Ohio Admin. Code § 4729-17-03; and (2) that an individual must tell the truth when making a report to the government pursuant to Ohio Rev. Code § 2921.13(7).[12] The Court disagrees.

It has been recognized that courts in Ohio have not unanimously defined the breadth of the public policy exception. *Crowley v. St. Rita's Medical Ctr.*, 931 F. Supp. 2d 824, 829 (N.D. Ohio 2013). Some courts have required that a policy parallel the public policy set forth in Ohio's whistleblower statute, Ohio Rev. Code § 4113.52, to warrant relief pursuant to a wrongful discharge claim. In order to parallel the whistleblower policy, courts have held that the policy must be one that "imposes an affirmative duty on the employee to report a violation, specifically prohibit[s] employers from retaliating against employees who had filed complaints, or that protect[s] the public's health or safety." *Dean v. Consol. Equities Realty #3, LLC*, 182 Ohio App. 3d 725, 729 (1st Dist. 2009). The decision in *Hale*, 158 Ohio App. 3d at 427, upon which

---

[12] Plaintiff has the burden to identify the public policy and the sources of that policy. *Dohme v. Eurand Am., Inc.*, 130 Ohio St. 3d 168, 173 (2011). A court may not do so *sua sponte*, as "[t]here may be valid reasons for a plaintiff's failure to identify and assert a specific public policy or a specific source for that public policy." *Id.* The court "may not fill in the blanks on its own motion." *Id.* As such, the Court considers only the two public policies specifically identified by Plaintiff.

Defendant relies, is one such case that imposed the parallelism requirement.  The court held that the plaintiff had not stated a *Greeley* claim in part because the underlying administrative regulations governing the operation of residential drug treatment centers did not require reporting or provide protection against retaliation.  *Id.*

Other courts implicitly have imposed the same requirements. *See Sutton v. Tomco Machining, Inc.*, 129 Ohio St. 3d 153, 160 (2011) (clarity element satisfied where underlying statute prohibited retaliation against employees who pursued worker's compensation claims); *Dolan v. St. Mary's Mem'l Home*, 153 Ohio App. 3d 441 (1st Dist. 2003) (clear public policy in nursing home patient's bill of rights codified in Ohio statutory law because it protects the health and safety of patients and prevents retaliation); *Kulch v. Structural Fibers*, 78 Ohio St. 3d 134 (1997) (clarity element satisfied where public policy at issue was employee safety and the plaintiff invoked the federal OHSA statute along with related federal laws).

Still other courts appear to have recognized that the statute need not specifically pertain to employment to qualify as a clear public policy.  For example, the Ohio Supreme Court held in *Collins v. Rizkana*, 73 Ohio St. 3d 65 (1995) that a criminal sex offense statute that did not specifically address the employers' responsibilities or employees' rights established a clear public policy.  Similarly, in *Alexander v. Cleveland Clinic Foundation,* No. 95727, 2012 Ohio App. LEXIS 1519, at *13-15 (8th Dist. April 19, 2012), a case relied upon by Plaintiff, the court held that a former police officer had established a clear public policy that police officers must uphold or enforce the laws of the state of Ohio when he based his claim on Ohio Rev. Code § 1702.80(D), which provides for a police department "to preserve the peace, protect persons and property, enforce the laws of the state" and which vests the same powers and authority with each police officer.  The court held there is "no requirement that a supporting statute be employment-

related or otherwise set forth an employer's responsibilities and/or an employee's rights." *Id.* Nevertheless, the court recognized that it was inherent in the duties of a police officer to enforce the law for the protection and safety of others and that the plaintiff should not be fired for performing those inherent duties. *Id.* at *13-15. As for *Avery v. Joint Township District Memorial Hospital*, 286 F. App'x 256, 262 (6th Cir. 2008), another case upon which Plaintiff relies, the circuit court held that the clarity element was satisfied even where the underlying regulations concerning the falsification of medical records did not require reporting or prohibit retaliation, noting that the plaintiff had cited to an "[a]bundance of authority prohibiting the falsification of medical records." *Id.*

Nevertheless, the Northern District of Ohio recently expressed concerns about expanding the public policy exception too far. *Crowley*, 931 F. Supp. 2d at 831. The district court recognized that without limiting public policy claims to those policies that parallel the policy in the whistleblower statute, *"Greeley* claims could evolve from exceptions to the employment at-will doctrine to the rule itself." *Id.* With that understanding in mind, the district court rejected the plaintiff's argument that the deliberate and deceitful falsification of corporate documents, although an important public policy, gave rise to a *Greeley* claim. *Id.*

Regardless of the view followed, the Court finds that Plaintiff has not established in this case that a clear public policy was violated by her discharge. Plaintiff relies solely on Section 4729-17-03 to support a clear public policy as to the record-keeping requirements. While the Court agrees that Section 2729-17-03 demonstrates an interest in ensuring record-keeping processes are followed in order to properly account for narcotics, Plaintiff has not established that the public policy is so manifestly clear to warrant abrogating the employment at-will doctrine. Plaintiff has not demonstrated that the administrative regulations parallel the

whistleblower statute.  The regulation does not require employees to report violations of the process set forth therein nor does it prohibit the facility from terminating an employee for such reports.  Plaintiff also has not argued that she was terminated for reporting criminal violations or for reporting concerns relating to workplace or public health or safety.

Moreover, Plaintiff has not explained how this administrative regulation is similar to any of the non-employment statutes that courts have found fall within the exception to the employment at-will doctrine or why this particular non-employment regulation should otherwise warrant application of the exception.[13]  The mere fact that a subject matter is covered by an administrative regulation and *may* serve as a basis for a public policy claim does not mean that each and every such regulation will be found to set forth a clear public policy.  Accepting an argument that a clear public policy is established because an administrative regulation covers the subject matter at issue would expand the public policy claim to all statutory and administrative enactments.  Under that view, the exception would swallow the rule.  *See Crowley*, 931 F. Supp. 2d at 831.

Even having reviewed the cases involving statutes or regulations that are relied upon by Plaintiff, the Court finds them distinguishable.  *Collins* involves the reporting of a criminal violation, *Alexander* concerns inherent duties of a police officer to enforce the law for the benefit of public safety, and *Avery* involves circumstances where the plaintiff presented an "[a]bundance of authority" supporting a clear public policy.  None of those circumstances are present here. The record presented here instead indicates that this case is more akin to *Hale* and *Morris* in which the courts held that no clear public policy was manifested where the plaintiffs relied merely on baseline technical requirements that the facilities had to satisfy to operate their

---

[13] *See United States v. Robinson*, 390 F.3d 853, 886 (6th Cir. 2004) ("We have cautioned that . . . it is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.").

facilities. *Hale*, 158 Ohio App. 3d at 428; *Morris v. Dobbins Nursing Home*, No. CA2010-12-102, 2011 Ohio App. LEXIS 2535, at *15-16 (12th Dist. June 20, 2011). "By relying solely on these technical administrative regulations, without relying on the public policy embodied in the whistleblower statute, [the plaintiffs] could not demonstrate that their termination violated public policy." *Hale*, 158 Ohio App. 3d at 428; *see also Morris*, 2011 Ohio App. LEXIS 2535, at *15.

Plaintiff's second argument that a clear public policy exists that prevents employers from retaliating against employees who refuse to make untruthful statements in violation of the law fares no better. Plaintiff relies on Ohio Rev. Code § 2921.13(7) to show that she would have committed a criminal offense if she made false statements to the DEA agent. Section 2921.13(7) provides that "[n]o person shall knowingly make a false statement, or knowingly swear or affirm the truth of a false statement previously made when . . . [t]he statement is in writing on or in connection with a report or return that is required or authorized by law." Plaintiff does not explain or cite any authority to support her position that the statements made to a DEA agent indeed would fall under that provision of the Ohio Revised Code. Assuming, however, that Plaintiff's statements would have constituted a criminal offense under that provision, Plaintiff's reliance on *Anders v. Specialty Chemical Resources*, 121 Ohio App. 3d 348, 358 (8th App. 1997) does not show that a clear public policy exists that precludes an employer from retaliating against an employee for generally refusing to violate a criminal statute. In fact, *Anders* is inapposite this case. In *Anders*, the court found a clear public policy for an employee who refused to participate in the employer's alleged insurance fraud and/or falsification scheme, including refusing to create documents to support the termination of two employees. 121 Ohio App. 3d at 358. Here, unlike in *Anders*, Plaintiff was not refusing to participate in an illegal practice of Defendant nor was she otherwise influenced, encouraged, pressured or requested by

Defendant to engage in such a practice. Instead, Plaintiff was making an uninfluenced decision to abide by, rather than break, the law. *Anders* thus does not support a clear public policy applicable to the situation here.[14]

To find a clear public policy that precludes retaliation against employees who generally choose to abide by the law and not to commit criminal offenses would unnecessarily expand the public policy exception. In this case in particular, the argument presented by Plaintiff is in essence an end-around the central issue of whether the content or context of the truthful statements made by Plaintiff are subject to a clear public policy. Plaintiff has not met her burden of demonstrating the existence of such a clear public policy in this instance.

**2. Jeopardy Element**

As the Court has rejected Plaintiff's clarity arguments, summary judgment is appropriate on that ground alone. Even if, however, Plaintiff had shown a clear public policy, Plaintiff has not satisfied the jeopardy element.

A jeopardy analysis requires a court to determine whether dismissal of an employee jeopardizes a clear public policy. *See Sutton*, 129 Ohio St. 3d at 160-61. To satisfy the jeopardy element, a plaintiff's conduct need not be based on a correct belief the defendant is violating a public policy, but he must have a good faith belief that his complaint is valid. *Himmel v. Ford Motor Co.*, 342 F.3d 593, 600 (6th Cir. 2003) (citing *Kulch*, 78 Ohio St. 3d 134; *Pytlinski v. Brocar Prods.*, 94 Ohio St. 3d 77 (2002)). Although Ohio state courts have not done so, the Sixth Circuit has utilized a three-part analysis in which the court (1) determines the kind of conduct necessary to further the clear public policy (2) decides whether plaintiff's conduct is

---

[14] This conclusion is narrowly focused on the policy as it has been specifically identified by Plaintiff in this case. This conclusion is not intended to foreclose the possibility that a clear public policy could exist under circumstances similar to those presented in this case. Nevertheless, it is Plaintiff's burden to satisfy the clarity element and the Court may not fill in the blanks *sua sponte*.

within the scope of what the policy protects; and (3) considers whether employees would be discouraged from engaging in similar conduct by the threat of dismissal. *Avery*, 286 F. App'x at 264; *Himmel v. Ford Motor Co.*, 342 F.3d 593, 599 (6th Cir. 2003).

Plaintiff contends that the jeopardy element is satisfied. She argues that employees should not have to face the choice between honestly answering questions posed by government regulatory bodies and keeping their job. She also argues that Defendant had adequate notice that she was invoking a government policy because she told Carroll that the DEA had called which made it obvious her statements were related to a governmental policy. She further contends in a conclusory fashion that employees, especially those with direct knowledge of the offending conduct, would be discouraged from providing the requested information.

Defendant disputes Plaintiff's arguments. It claims that Plaintiff admitted there was no violation of the pharmacy regulations, that she did not notify Defendant she was vindicating a government policy or even inform Defendant she had made statements to the DEA concerning potential record-keeping deficiencies, and that Plaintiff and other employees could pursue a claim under the whistleblower statute set forth in Ohio Rev. Code § 4113.52(3).

Here, the Court finds that the public policy would not be jeopardized by the discharge of Plaintiff. Although the good faith reporting of record-keeping violations pursuant to Ohio Admin. Code § 4729-17-03 would further compliance with the purported public policies, the conduct of Plaintiff fails to fall within the scope of the conduct to be protected. There is no indication that Plaintiff actually informed the DEA or anyone else of any actual or potential violations of the record-keeping policy by Defendant. *Avery*, 286 F. App'x at 265 (plaintiff could not satisfy jeopardy element where she made no report of wrongdoing). Plaintiff testified that she told the DEA about the procedures she utilized for reconciling the location of the drugs

29

and the paperwork, which she believed to be correct, but that she could not confirm that was the way everyone did it.  Although she testified that she had knowledge that Muchmore was performing the task inappropriately, she indicated that she "did not say that to anybody."  (Doc. 22, p. 109).  She does not recall whether she ever told Carroll about Muchmore's mistakes.[15]

The evidence presented also does not indicate that a reasonable employer would have been put on notice that the plaintiff was invoking a governmental policy as the basis of her complaint.  *Avery v. Joint Twp. Dist. Mem'l Hosp.*, 504 F. Supp. 2d 248, 257 (N.D. Ohio 2007) (citing *Jermer v. Siemens Energy & Automation, Inc.*, 395 F.3d 655, 656 (6th Cir. 2005)).  Not only is there no indication that Plaintiff actually made a complaint or informed the DEA of any actual or potential violation of the record-keeping policy, but there also is no evidence presented that Plaintiff discussed with Defendant any record-keeping issue she mentioned to the DEA.  Plaintiff relies on the fact that she informed Carroll that the DEA had called and thought they wanted to discuss the Mt. Orab facility.  She did not, however, tell him the exact reasons the DEA had contacted her or that she had made statements to the DEA of actual or potential violations of the administrative regulations.  Carroll thus was not on notice that he was no longer dealing with an at-will employee.  Moreover, Plaintiff has not presented any evidence beyond pure speculation that shows prior to Plaintiff's termination Carroll learned about Plaintiff's statements to the DEA or informed anyone involved in Plaintiff's termination about such statements to the DEA.  Importantly, Plaintiff testified that she had no facts indicating that Defendant was aware that she was participating in any investigation by the DEA or any other regulatory body.

---

[15] Although Defendant further relies on Plaintiff's testimony that she had no personal knowledge that Defendant was doing anything illegal under the pharmacy regulations, the Court gives that argument no weight because Ohio law does not require that Plaintiff be certain that any conduct at issue actually is illegal.  *Himmel v. Ford Motor Co.*, 342 F.3d 593, 600 (6th Cir. 2003).

Given that no evidence has been presented to the Court that shows Plaintiff complained of or identified any actual or potential violation of the policy, that she informed anyone of the nature of her statements to the DEA, or that anyone making the termination decision was aware of her contact with the DEA prior to her termination, the timing of Plaintiff's phone call with the DEA and the timecard audit and ultimate discharge of Plaintiff are merely coincidental. Plaintiff's discharge thus would not discourage other employees from complaining about conduct potentially violating a clear public policy.  In addition, Plaintiff admitted that Defendant did not discourage her from filing a claim under the whistleblower statute to the extent applicable such that neither Plaintiff nor her co-workers would be dissuaded from reporting the unlawful conduct of their co-workers in accordance with that statute.[16]

### 3.  Causation and Overriding Business Justification Elements

Given the above conclusions that Plaintiff did not, as a matter of law, meet the first two elements of her wrongful discharge claim, that claim cannot survive summary judgment.  As such, the Court need not address her remaining arguments as to causation and overriding business justifications.  Nevertheless, the Court finds that Plaintiff's claim would fail on these two grounds as well.  The crux of Plaintiff's causation argument is the temporal proximity of her statements to the DEA and her timecard audit and ultimate termination.  Yet, as explained above, the evidence does not establish anything more than a coincidental connection between the events. The inconsistent explanations for the timecard audit standing alone do not create the requisite causal connection.  Moreover, Plaintiff has not met her burden of proving pretext.  Although the Court recognizes that the standard for proving pretext and proving a lack of an overriding business justification are not necessarily identical, Plaintiff has not explained beyond the pretext

---

[16] With respect to any conduct potentially falling under one of the specific policies identified here, however, neither party has presented any argument as to whether there would be alternative remedies.

arguments how Defendant otherwise lacked a justification that was essential and necessary to the operation of the business.  *See* OJI CV § 537.17(4) & cmt.  The failure to establish pretext thus guides the conclusion here, and Plaintiff's claim would fail on these bases as well.

## IV.    <u>CONCLUSION</u>

Consistent with the foregoing, Defendant's Motion for Summary Judgment (Doc. 13) is hereby **GRANTED**.  Plaintiff's age discrimination claim in Count I, gender discrimination claim in Count II, and wrongful discharge claim in Count III are hereby **DISMISSED WITH PREJUDICE**, and this matter shall be **CLOSED**.

**IT IS SO ORDERED.**

s/Michael R. Barrett

Michael R. Barrett, Judge
United States District Court